**GULF COAST FANS, INC.,**
**Plaintiff-Appellant,**

v.

**MIDWEST ELECTRONICS IMPORTERS, INC., Defendant-Appellee.**

**GULF COAST FANS, INC.,**
**Plaintiff-Appellant,**

v.

**CHAN KAN PING and Cheung Yick Yee, as partners, d/b/a Pax & Company, & Midwest Electronics Importers, Inc., Defendants-Appellees.**

**GULF COAST FANS, INC., Plaintiff,**

v.

**MIDWEST ELECTRONICS IMPORTERS, INC., Defendant.**

**GULF COAST FANS, INC.,**
**Plaintiff-Appellee,**

v.

**CHAN KAN PING and Cheung Yick Yee, as partners, d/b/a Pax & Company, Defendants-Appellants.**

Nos. 83–3303, 83–3455.

United States Court of Appeals, Eleventh Circuit.

Sept. 10, 1984.

As Amended on Denial of Rehearings Nov. 19, 1984.

---

T. Paine Kelly, Jr., Tampa, Fla., for plaintiff-appellant.

Steven D. Merryday, Robert B. Glenn, Tampa, Fla., for Midwest Electronic Importers.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

We are presented here with consolidated appeals from two related cases, which, although sharing the same set of facts, present quite different issues. For the reasons set forth below, we affirm in part and vacate in part the judgment based on the jury verdicts in No. 83–3303, and vacate the judgment in No. 83–3455.

## I. BACKGROUND

### A. *Facts*

The jury had before it evidence from which it could find the following facts. The three major players in this case are Gulf Coast Fans, Inc. ("Gulf Coast"), a Florida based distributor whose principal is Wilmer Barrett, Midwest Electronics Importers, Inc. ("Midwest"), a Chicago based importer headed by Nessim Bechar, and PAX & Company ("PAX"), a Hong Kong based export company run by Chan Kan Ping and Cheung Yick Yee.

In 1975, PAX entered into a written renewable contract with Din Wai Electrical Manufacturing Company, Ltd. of Hong Kong (DEMC), under the terms of which DEMC made PAX its exclusive agent for the export of DEMC ceiling fans to the United States. The contract was renewed annually and was in force during the period of time relative to this action.

At about the same time DEMC and PAX entered into their agreement, William Wallo, a Florida businessman, discovered a DEMC fan in a neighbor's house in Florida. The fan had been brought over from Hong

Kong by an airline pilot as a novelty item. The DEMC fan rekindled a previous interest in ceiling fans developed by Wallo during a trip to Brazil. Curious about the cost and quality of the DEMC fan, Wallo contacted Bechar, a business acquaintance from Chicago who happened to import electronic devices from the Far East. Bechar agreed to obtain six DEMC fans for Wallo on his next trip to the Orient. After contacting DEMC, Bechar was referred to PAX, which supplied him with several fans for Wallo. Wallo was pleased with the initial shipment of fans, and amazed at the low price he paid for them. After importing a gross (144) more fans through PAX and Bechar, Wallo decided to go into business selling DEMC ceiling fans on a full-time basis.

Wallo incorporated Gulf Coast Fans, Ltd. and entered into written agreements with PAX and Bechar whereby PAX made Gulf Coast, Ltd. its exclusive distributor for DEMC ceiling fans in the continental United States, and Gulf Coast, Ltd. made Midwest its exclusive importer of fans from PAX. PAX and Midwest also agreed that Gulf Coast would place all orders for fans placed through Midwest to PAX. Thus, upon receiving an order from Gulf Coast, Ltd., Midwest would contact PAX and place an order for the fans. Midwest would take delivery of the fans in Hong Kong. All fans were purchased f.o.b. Hong Kong. After delivery, PAX would invoice Midwest for the purchase price of the fans and Midwest would then invoice Gulf Coast, Ltd. for the purchase price plus a five percent (5%) import commission. Additionally, Midwest charged Gulf Coast, Ltd. another one percent because Midwest was providing Gulf Coast, Ltd. with the credit it needed to pay for the fans.

On the other hand, Gulf Coast, Ltd. received a six percent discount from PAX to be applied to advertising of DEMC fans. The six percent advertising allowance was based on a formula set forth in the contract between PAX and Gulf Coast, Ltd., whereby PAX agreed to pay six percent for all advertising done by Gulf Coast, up to maximum of six percent of the total invoice price of each shipment of fans. Because

Gulf Coast, Ltd. was expected to exceed the maximum advertising allowance on each shipment, however, PAX automatically deducted the six percent allowance "up front." Nevertheless, PAX did require Gulf Coast, Ltd. to provide proof of its use of the advertising allowance at a later date. Wallo testified that he submitted his proof of advertising to PAX every six months to a year, or "whenever I got a little worried that they [PAX] weren't going to give me the discount."

Wallo's business grew steadily and rapidly throughout 1976, 1977 and the beginning of 1978, and everyone seemed happy with the arrangement. Then, in May 1978, Wallo sold Gulf Coast, Ltd. to Wilmer Barrett, a former businessman who had become bored with his Florida retirement. Although Wallo did not inform Midwest or PAX of the pending sale until the week the sale was closed, they approved the sale and an assignment of Gulf Coast, Ltd.'s contracts to Barrett's new entity, Gulf Coast Fans, Inc.

Immediately upon taking over Gulf Coast, Barrett began making changes in the marketing of DEMC fans. Barrett also took little time to make it clear to Bechar that he believed Bechar was an unnecessary middleman in the operation. Bechar, on the other hand, believed that he was worth more than just a five percent commission. Bechar testified that he agreed to the five percent figure with Wallo only because they were friends and the new business was at the time of the agreement by no means assured of success. Nevertheless, the ceiling fan market continued to grow rapidly, and Barrett and Bechar, believing themselves contractually bound to each other anyway, were able to put aside their differences for the time being.

Many of the changes Barrett made at Gulf Coast were made with the knowledge, approval and cooperation of DEMC, PAX and Midwest. For example, Barrett sought to get Underwriters Laboratories (UL) to "list" DEMC's fans, which meant that the fans would be approved by UL and carry a UL label. To get the UL listing Barrett

had to persuade DEMC, through PAX, to make several adjustments in the manufacturing process. Those adjustments were made, and by mid-1979 DEMC was shipping UL approved fans to Gulf Coast. Another Barrett innovation was to develop a four-blade fan using the motor and the components of the DEMC three-blade fan. The new four-blade fan was then manufactured by DEMC.

Barrett also changed the method that Gulf Coast's predecessor used to market ceiling fans. Rather than simply marketing the "DEMC 36 inch fan" and the "DEMC 45 inch fan," Barrett gave the fans catchy names like "Seabreeze" and "Showboat." Barrett informed PAX that he was marketing his fans under these names, and PAX voiced no objections to the new marketing scheme. Barrett did not, however, inform PAX or Midwest that at the same time he was dropping the DEMC name from all advertising and even packaging of the fans. Thus, the DEMC fans became the "Gulf Coast Seabreeze" and the "Gulf Coast Showboat" in all promotional materials distributed by Gulf Coast.

Beginning in October, 1978, Bechar informed Barrett that PAX wanted to know how Gulf Coast was spending its advertising allowance. Barrett promised to provide Gulf Coast's proof of advertising, which would have shown his elimination of the DEMC name, within a short time. The proof of advertising was not forthcoming, however, despite numerous requests over the next few months. Those requests became demands, and finally threats as PAX and Midwest sought some proof that Gulf Coast was spending the six percent advertising allowance in an approved manner. Still, Barrett continued to put off providing such proof. By June or July of 1979, Bechar, acting on behalf of PAX, had informed Barrett that the advertising allowance would soon be discontinued. Barrett responded that he was simply "so gosh-darned busy" that he had not gotten around to compiling the proof, and pleaded for Bechar to "bear with me" on the issue. Of course, Midwest, PAX and DEMC remained in the dark about Barrett's gradual elimination of the DEMC name during this period.

Meanwhile, relations between Bechar and Barrett became even more strained following a meeting between Barrett, Bechar, and the partners of PAX in Hong Kong in December, 1978. The meeting was designed to help plan production goals and sales strategies for 1979. Bechar left Hong Kong on other business after several days, while Barrett stayed and continued his negotiations with PAX. After Bechar left, Barrett proposed a new contract with PAX. The new contract acknowledged that Midwest was the importer for Gulf Coast, but made it possible for Gulf Coast to drop Midwest without cause and deal directly with PAX. PAX telexed Bechar that Barrett had proposed a new contract that might be unfavorable to Bechar. Bechar returned to Hong Kong and accused Barrett of dealing behind his back. After further discussions all the parties agreed to stick with their original agreements, but by that time the well had been poisoned. As a result of the Hong Kong meeting, PAX appointed Bechar as its United States agent, thereby strengthening their relationship. PAX informed Barrett of its appointment of Bechar as agent.

One other action by Barrett contributed to the breakdown in relations between Gulf Coast and PAX/Midwest. That was Barrett's decision to use plastic shafts to hang fans from ceilings, rather than the steel shafts used by Gulf Coast's predecessor. Barrett's predecessor, Wallo, explained the history of the shafts used to hang DEMC fans in the United States. When Wallo first started importing DEMC fans, each fan came with an 18 inch "drop rod" made of very heavy steel. Wallo found that those shafts were too long for the low ceilings in American homes. He began cutting each rod into three shafts of four inches, six inches and eight inches respectively and giving his customers a choice of length. Wallo soon asked PAX whether DEMC would allow him to provide his own shafts, of a lighter gage steel, to save on shipping costs and cut down on the bulky

size of the boxes used to ship the fans. PAX approved Wallo's suggestion.

When Barrett switched to plastic shafts, however, he did not seek PAX's approval. Rather, Barrett made the switch, and PAX, fearing the new shafts were unsafe, objected as soon as it learned of the change. Barrett, however, ignored PAX's objections and disobeyed a command that Gulf Coast immediately stop using plastic shafts. Barrett also ignored a request by Fred Thomas, president of Sun Wholesale Corp., the largest retailer of DEMC fans, that plastic shafts not be used in any fans sold to Sun Wholesale.

The plastic shafts soon proved to be a disaster. Several of the shafts broke, resulting in at least one instance of a person suffering a minor injury when a fan fell on him at the Eastern Airlines counter in Sarasota, Florida. Thomas wrote to Barrett noting that at least six customers had complained of broken shafts, and requesting that Gulf Coast conduct a recall of all fans sold with plastic shafts. Barrett maintained to PAX, Midwest and Sun Wholesale that he had tested the plastic shafts and that they were safe. Later, however, Barrett discovered that the plastic tubing from which Gulf Coast was making shafts contained manufacturing inconsistencies that made the tubing weaker in some places than others. Those deficiencies were causing the shafts to fail, and Barrett eventually switched back to steel shafts.

In addition to the pressure building between Gulf Coast and PAX/Midwest due to Barrett's changes in the business, market conditions were also putting a strain on the relationship between the parties. By 1979 the ceiling fan market in the United States had exploded as people began to purchase ceiling fans as an economical, as well as decorative, method of cooling their homes. Despite increased competition from other ceiling fan manufacturers and distributors, Gulf Coast was able to sell as many fans as DEMC could manufacture. As a matter of fact, Gulf Coast's *potential* to sell had exceeded DEMC's maximum capacity to manufacture, and so Gulf Coast had been forced early in 1979 to abandon any efforts to recruit new customers. As it was, Gulf Coast was hard pressed simply to supply the demands of its then current customers.

Obviously, the booming market for ceiling fans was profitable for all—DEMC, PAX, Midwest and Gulf Coast. But Barrett was frustrated by DEMC's inability to keep up with the growing demand for even more ceiling fans, and Gulf Coast soon began making preliminary contacts with other ceiling fan manufacturers in the Far East, presumably in the hope of obtaining an additional supply of fans. Gulf Coast also contacted an American firm about the possibility of producing an "American copy" of the DEMC fan motor. PAX and Midwest apparently were unaware of these contacts by Gulf Coast, but do appear to have been aware of Barrett's general frustration at not being able to expand his market further.

By July, 1979, relations between the parties had reached a breaking point. In late July Bechar went to Safety Harbor, Florida to meet with Barrett. Bechar reviewed the problems between Gulf Coast and PAX/Midwest concerning the advertising allowance and use of plastic shafts. Bechar also asked Barrett what value Barrett placed on his exclusive contract with DEMC. Finally, Bechar stated that the exclusive contract was over, and that he intended to go to a large industry trade show in Chicago in August to sell DEMC fans to anyone who wanted to buy them.

The point at which Bechar announced that Gulf Coast's exclusive contract was at an end is unclear. It is clear, however, that during Bechar's stay in Florida he and Barrett discussed a sale of Barrett's business to Bechar. Although they at one point apparently agreed in principle on a sale, they never could agree on a price and the sale never materialized. At about the same time, Barrett proposed a sale to a partnership that would consist of Bechar, Thomas (of Sun Wholesale), and Ted Winkler, the sales manager of Gulf Coast. That partnership, too, never materialized and again no sale took place. Thus, Bechar's visit ended with him leaving and promising to sell fans in Chicago, and Barrett threat-

ening to sue Bechar to keep him from attending the trade show.

Barrett followed through with his threat a few days later by filing suit in Florida court seeking to enjoin Bechar from attending the Chicago trade show, and seeking to enjoin Midwest and PAX from refusing to sell fans to Gulf Coast. The injunction was denied. Gulf Coast then filed separate actions for damages due to breach of contract against Midwest and PAX in Florida court. Those actions were removed to the federal district court and eventually·consolidated.

## B. *Additional Proceedings*

Although these cases were consolidated for trial, they have followed distinctly dissimilar paths to our court. No. 83–3303 is *Gulf Coast v. Midwest.* In that case, Midwest defended on the basis that Gulf Coast breached the contract first, either (1) by proposing a new contract in Hong Kong in December, 1978 that would have allowed Gulf Coast to dump Midwest at will, or (2) by failing to account for advertising expenditures and by substituting plastic shafts into the DEMC fans over the express disapproval of PAX and Midwest. Additionally, Midwest counterclaimed for over $100,000 in unaccounted for advertising discounts advanced to Gulf Coast. Trial was by jury. Using a special verdict form, the jury found that Gulf Coast had not breached its contract with Midwest at the 1978 Hong Kong meeting, but had breached its contract by failing to account for its advertising allowances and by substituting materials without approval. Additionally, the jury ruled in Midwest's favor on the counterclaim and awarded approximately $115,000 in damages to Midwest. Gulf Coast appealed. As discussed below, there is a question of whether Gulf Coast's notice of appeal was premature.

No. 83–3455 is *Gulf Coast v. PAX.* The procedural history of that case is much more complicated than No. 83–3033. PAX initially moved to dismiss Gulf Coast's complaint against it for lack of personal jurisdiction and improper service of process. Although a magistrate recommended granting the motion for dismissal, the dis-

trict court ruled that a disputed factual issue over the agency relationship between Bechar and PAX was involved in determining jurisdiction, and would require trial. The court also ruled that Gulf Coast had served PAX improperly, but allowed Gulf Coast 45 days to comply with the requirements of Florida rules for service of process. Instead, Gulf Coast served PAX pursuant to federal rules for service. PAX then filed an answer, claiming lack of personal jurisdiction and improper service, as well as defenses similar to those raised by Midwest in its case.

On the day trial was to begin, however, PAX's attorney was allowed to withdraw from the case upon showing that PAX intended to proceed no further. The district court then granted a motion by Gulf Coast for entry of default against PAX. Following the trial between Gulf Coast and Midwest, the trial court entered an order confirming certain oral rulings it had made at the beginning of the trial. The order reiterated that PAX's counsel's motion for leave to withdraw was granted and counsel was "discharged of and from any further obligation or responsibility to defend the action." The order confirmed the entry of default against PAX. The court also acknowledged that, during the course of trial, it had severed Gulf Coast's claims against PAX and, upon Gulf Coast's waiver of its right to a jury trial against PAX, a judgment by default would be entered in favor of Gulf Coast upon Gulf Coast's application and three days' notice to PAX. The clerk of the United States district court duly entered a default against PAX on September 13, 1982.

On September 23, 1982, Gulf Coast filed its motion for judgment by default and supporting memorandum and served copies on the attorney for Midwest and PAX's former attorney, but did not serve PAX. The motion for judgment by default requested a hearing on damages against PAX, after notice. The court directed the clerk to schedule a hearing on Gulf Coast's motion for judgment by default on October 19, 1982, and further directed Gulf Coast to forward a copy of the motion for judgment

by default, as well as a copy of the order, to PAX.

On October 1, 1982, counsel for Gulf Coast appeared before the court, requested and was granted 20 days in which to file a memorandum on damages. At that time, Gulf Coast's counsel submitted proof of service on PAX of the court's order and the motion for judgment by default. Counsel did not, however, file a copy of the motion for judgment by default and notice of the October 19, 1982 hearing on damages. Gulf Coast duly served its memorandum on counsel for Midwest and PAX's former counsel, but did not serve PAX. PAX later asserted by way of an affidavit from Chan Kan Ping, that it did not receive notice of the October 19 hearing until October 23.

Counsel for PAX, on December 1, 1982, re-entered the case and filed a motion for leave to file a memorandum in opposition to plaintiff's motion for judgment by default. Gulf Coast opposed that motion and PAX subsequently filed its reply to Gulf Coast's opposing memorandum, asserting lack of notice of the hearing on damages. On January 5, 1983, the court rendered its order denying PAX's request to respond to damages and granting Gulf Coast's motion for judgment by default. The order declared that Gulf Coast had complied with notice requirements, that PAX had failed to contest the adequacy of its notice of hearing, and instructed the clerk to enter judgment in favor of Gulf Coast in the amount of $525,775.47 plus costs. On the following day, the clerk entered judgment in that amount against PAX.

PAX then filed a motion for "rehearing" of the judgment by default on January 17, 1983, and Gulf Coast filed an opposing memorandum. PAX subsequently replied and, additionally, filed a supplement to its reply memorandum addressing the still unresolved matter of improper service of process abroad and lack of *in personam* jurisdiction over PAX. Gulf Coast filed its memorandum in reply to PAX's supplement. PAX then responded to Gulf Coast's reply and, again, Gulf Coast replied. On June 8, 1983, the district court entered its order denying PAX's motion for rehearing.

On July 8, 1983, PAX filed its notice of appeal of the order on Gulf Coast's motion for judgment by default and judgment entered thereon, as well as the order denying PAX's motion for rehearing.

## II. PRELIMINARY ISSUES OF APPELLATE JURISDICTION

Motions have been filed to dismiss both appeals in this case. An administrative panel of the Eleventh Circuit ordered that those motions be carried with the case. Therefore, we must dispose of motions to dismiss before we proceed to the merits.

■ Following the entry of judgment against Gulf Coast in No. 83–3303 (*Gulf Coast v. Midwest*), Gulf Coast timely moved for judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b), or for a new trial pursuant to Fed.R.Civ.P. 59. Motions made under either Rule 50(b) or Rule 59 extend the time for filing a notice of appeal until 30 days following disposition of the motion. Fed.R.App.P. 4(a)(4). The district court denied Gulf Coast's motions on March 25, 1983, and Gulf Coast filed its notice of appeal on April 22, 1983.

In No. 83–3455 (*Gulf Coast v. PAX*), the district court entered judgment by default on January 5, 1983. Within 10 days of that order, PAX filed a motion for "rehearing" asking the district court to vacate its entry of default judgment on several grounds. Whether PAX's motion extended the time for filing a notice of appeal under Fed.R. App.P. 4(a)(4) has been unclear. At any rate, the district court denied PAX's motion on June 8, 1983, and PAX filed its notice of appeal 30 days later.

Midwest has moved to dismiss Gulf Coast's appeal in No. 83–3303 on the ground that Gulf Coast's notice of appeal was premature. Midwest contends that because No. 83–3303 was consolidated with No. 83–3455 for trial, then Gulf Coast could not file a notice of appeal until all proceedings in *both* cases were completed. Thus, Midwest argues that Gulf Coast could not file a notice of appeal before the district court's final order on June 8, 1983, denying PAX's motion to vacate the default judgment. Since Gulf Coast filed its notice of

appeal on April 22, 1983, Midwest contends Gulf Coast's notice was premature and that the appeal must therefore be dismissed.

We find that Midwest's motion to dismiss the appeal in No. 83–3303 is frivolous. Midwest has completely ignored the district court's oral order, confirmed in a written order entered September 13, 1983, severing the trial of Midwest's case from that of PAX. That severance order eliminates any basis for Midwest's argument that the notice of appeal in No. 83–3303 is somehow contingent on the proceedings in No. 83–3455. Therefore, Midwest's motion to dismiss the appeal in No. 83–3303 is DENIED.

In No. 83–3455, Gulf Coast has moved to dismiss PAX's appeal on the ground that PAX's notice of appeal was filed too late. Gulf Coast argues that PAX's motion to vacate the default judgment was not a motion that falls within any of the categories listed in Fed.R.App.P. 4(a)(4), which would extend the time for filing an appeal. Thus, Gulf Coast contends that PAX had 30 days to file its notice of appeal beginning with the district court's entry of default judgment on January 5, 1983. Since PAX's notice of appeal was not filed until July, 1983, Gulf Coast contends the appeal should be dismissed.

Our disposition of Gulf Coast's motion to dismiss depends in part on our characterization of PAX's motion for rehearing in the district court. PAX contends that the motion to vacate was intended as, and is best characterized as, a Rule 52(b) motion to amend a judgment, or as a Rule 59 motion for a new trial. Either motion would extend the time for filing a notice of appeal. Fed.R.App.P. 4(a)(4). Gulf Coast, however, asserts that PAX's motion to vacate was, in essence, a motion to set aside the default judgment pursuant to Rule 55(c). Rule 55(c), in turn, requires that a motion to set aside a default judgment must be made "in accordance with Rule 60(b)." A Rule 60(b) motion does not extend the time for filing a notice of appeal. *See* Fed.R.App.P. 4(a)(4).

We agree with Gulf Coast that PAX's post-judgment motion was a motion to set aside the default judgment. Rule 55(c) makes it clear that the proper, and in our opinion, exclusive, method for attacking a default judgment in the district court is by way of a Rule 60(b) motion. Therefore, because Rule 60(b) does not extend the time for filing a notice of appeal, PAX was required to file its notice of appeal within 30 days of the district court's January 5, 1983 entry of default judgment against PAX. That does not mean, however, that we must dismiss PAX's appeal. The denial of a Rule 60(b) motion is, in itself, a final appealable order. *Silas v. Sears, Roebuck & Co., Inc.,* 586 F.2d 382, 389 (5th Cir.1978); 7 Moore, *Federal Practice* ¶ 60.30[3]. Thus, PAX's failure to file a notice of appeal until after the denial of what we have now concluded was a Rule 60(b) motion, means that our review on appeal is restricted to those issues raised in PAX's Rule 60(b) motion. *See Weedon v. Gaden,* 419 F.2d 303, 306–08 (D.C.Cir.1969). Because PAX's Rule 60(b) motion raised all of the issues raised in PAX's appeal here, we have no need to dismiss any part of the appeal. Nevertheless, as we discuss below, the standard of review that we use will be the less stringent standard for the denial of a Rule 60(b) motion.

## III. DISCUSSION ON THE MERITS

### A. *No. 83–3303, Midwest v. Gulf Coast*

### 1. *Introduction*

Gulf Coast has raised three issues in its appeal. First, Gulf Coast claims that Midwest presented insufficient evidence on the issue of Gulf Coast's breach of its contract with Midwest to create a jury question. Second, Gulf Coast contends that the district court erred in several of its instructions to the jury, and in its submission of special interrogatories to the jury on the jury's verdict form. Third, Gulf Coast asserts that Midwest failed in its counterclaim to prove that it was entitled to stand in PAX's shoes to recover the disputed six percent advertising allowance from Gulf Coast. We find that the first two issues have no merit, and therefore uphold the jury's verdict that Midwest is not liable to Gulf Coast for breach of contract. We agree with Gulf Coast on the third issue,

however, and therefore vacate the judgment based on the jury's verdict in favor of Midwest on its counterclaim.

### 2. *Discussion*

■ The jury found, by way of special interrogatories, that Gulf Coast breached its contract with Midwest by making unauthorized alterations in the shafts used to hang DEMC ceiling fans, and by "failing to comply with reasonable obligations imposed by PAX concerning advertising." Gulf Coast contends that the jury's finding is unsupported by the evidence. As our recital of the facts demonstrates, however, overwhelming evidence supported the jury's findings. Moreover, we note that Gulf Coast, as plaintiff, bore the burden of proving affirmatively its claim of breach by Midwest. We believe that the jury's findings not only show that it believed Midwest's theory of the case, but that it rejected Gulf Coast's evidence, which it could have done even if Midwest had failed to introduce any evidence.

Nevertheless, Gulf Coast seems to argue that although the evidence supports the jury's findings, such evidence did not *legally* amount to a breach of contract by Gulf Coast because Gulf Coast's conduct did not violate any specific provision of its written contract with Midwest. We need not enter into an extended discussion of contract law to dispose of Gulf Coast's contention. The entire agreement between Gulf Coast and Midwest is set forth below:

## PRINCIPALS

Manufacturer — Din Wai Electrical Manufacturing Company (D.E.M.C.)
Hong Kong

Sold through Exporter — Pax and Company (PAX)
Hong Kong

Importer — Midwest Electronics Importers, Inc. (M.E.I.)
Lincolnwood, Illinois
an Illinois corporation
Sim Bechar, President

Purchaser — Gulf Coast Fans, Ltd., Inc. (G.C.F.)
Clearwater, Florida
a Florida corporation
William H. Wallo, President

---

## CONTRACT

G.C.F. shall be the exclusive distributor of D.E.M.C. ceiling fans within the United States exclusive of Hawaii.

M.E.I. agrees to import overhead ceiling fans exclusively for G.C.F.

G.C.F. agrees to use M.E.I. as their exclusive importer for all overhead ceiling fans purchased by them outside the U.S.A.

M.E.I. terms will be net 45 days.

The term of this contract shall be 5 years from the date hereof provided this agreement shall terminate if G.C.F. ceases to purchase fans overseas, or if this agreement is in default and M.E.I. will then have the right to import or sell fans to anyone of their choice, and all parties shall be released herefrom.

CORPORATE SEAL /s/ Sim Bechar
 Sim Bechar, PRESIDENT
DATE 5–18–78 Midwest Electronics Importers

CORPORATE SEAL /s/ William H. Wallo
 W. H. Wallo, President
DATE 5–18–78 Gulf Coast Fans, Ltd., Inc.

 Witness: /s/ Ernest M. Schwartz
 Witness: /s/ J. H. Weisemiller

That agreement was prepared by William Wallo, Barrett's predecessor at Gulf Coast, at a time when Wallo and Bechar were good friends just getting started in their business relationship. Wallo has no legal training, and he stated at trial that neither he nor Bechar bothered to have a lawyer review the contract. Even a casual observer can see that the contract was woefully inadequate to constitute the entire agreement between the parties. For example, the contract fails to mention the five percent commission that Midwest was to receive on each fan that it imported. We find it difficult to believe that Gulf Coast would argue, however, that because the five percent commission is not mentioned in this contract, then Gulf Coast could stop paying the five percent commission without breaching its contract with Midwest. In short, it is clear that the relationship between Midwest and Gulf Coast was governed in large part by their course of dealings as evidenced by their correspondence and certain oral agreements reached at various meetings between their principals.

Additionally, the relationship between Midwest and Gulf Coast was constrained by their relationships with PAX and DEMC. For example, no written agreement existed between Gulf Coast and Midwest concerning the six percent advertising allowance granted to Gulf Coast by PAX. But Gulf Coast's agreement with PAX does set forth the advertising allowance, and further provides that Gulf Coast shall "endeavor to promote sales of DEMC Brand Ceiling fans." Clearly, if Gulf Coast breached the contract with PAX, thereby causing PAX to refuse to sell fans to Midwest for import to Gulf Coast, then Gulf Coast would have breached its contract with Midwest by making Midwest's performance impossible.

■ We believe that the jury found, in essence, that Gulf Coast had a contract with Midwest that encompassed the parties' written agreement, their course of dealings, and their relationships with PAX and DEMC, and that Gulf Coast breached the contract first, thereby justifying Midwest's later act of refusing to import DEMC fans exclusively for Gulf Coast. The record as a whole supports those findings. Therefore, Gulf Coast's first contention must fall.

Gulf Coast's second contention, that certain jury instructions and special interrogatories were erroneous, also must fall. Essentially, Gulf Coast's arguments in this regard are a variation of its first argument: Gulf Coast contends (1) that the jury should have been instructed to consider *only* the written contract between Gulf Coast and Midwest, and (2) that the trial court's special interrogatories allowed the jury to *assume* that some contractual obligation existed between the parties regarding advertising and alteration of fans, and that the only question for the jury to answer was whether those obligations were violated. As we stated in our discussion of Gulf Coast's first contention, however, we believe that under the peculiar facts of this case the jury was free to go outside the parties' written contract. Furthermore, we hold that the special interrogatories answered by the jury required it to find both

that certain contractual obligations existed, and that those obligations had been violated.

Accordingly, we must affirm the jury's verdict to the extent that it relieves Midwest of liability to Gulf Coast on Gulf Coast's breach of contract claim.

Gulf Coast's final contention, however, challenging the award to Midwest on its counterclaim for the advertising allowance, merits reversal of that award. At trial, Midwest proved without a doubt that Gulf Coast failed to account to PAX or Midwest for the six percent advertising allowance, despite numerous requests for such an accounting. Gulf Coast argues, however, that Midwest failed to show that it, and not PAX, was entitled to the unaccounted for advertising allowance. Midwest counters that it proved, through the introduction of a letter from PAX to Gulf Coast, that PAX had appointed Bechar as its United States agent, and had thereby made Bechar responsible for seeing that the advertising allowance was spent properly.

 We can assume, for our purposes here, that Bechar was PAX's agent and that PAX charged Bechar with overseeing Gulf Coast's advertising expenditures. Those facts standing alone, however, do not entitle Bechar or Midwest to recover the unaccounted for or misspent, advertising funds from Gulf Coast. Midwest must also show that it was somehow out-of-pocket for those expenses. In other words, Midwest failed to show that PAX ever billed or even threatened to bill Midwest for its failure to get an accounting from Gulf Coast, or in any other way passed the expense of the advertising allowance on to Midwest. All of the advertising money advanced to Gulf Coast came out of the pockets of PAX, not Midwest, and thus it would be PAX who would be entitled to recover the advertising money. Additionally, there was no evidence that PAX made Bechar or Midwest its agent for purposes of this litigation to recover the advertising money from Gulf Coast on behalf of PAX. Since PAX was involved in the same suit, there was no need for PAX to use Midwest as an agent to the litigation.

In short, we conclude that the jury's verdict on the counterclaim effectively awarded PAX's money to Midwest. Midwest was not entitled to that money, and so the judgment based on the jury's verdict on the counterclaim must be vacated.

### B. *No. 83–3455, Gulf Coast v. PAX*

#### 1. *Introduction*

PAX raises three issues in its appeal from the denial of its motion to set aside the default judgment. The first issue is whether the trial court obtained in personam jurisdiction over PAX. The second is whether the district court erred in denying certain procedural rights to PAX, including the right to have a jury determine the issue of damages, the right to notice of the hearing on damages, and the right to respond to Gulf Coast's memorandum on damages. The third is whether the district court erred in awarding damages either because the jury verdict in the *Gulf Coast v. Midwest* case exonerated PAX from liability, or because the district court's computation of damages ignored substantive principles of law governing damages.

#### 2. *Standard of Review*

 As noted above, we are here reviewing the district court's denial of a Fed. R.Civ.P. 55(c) motion to set aside a default judgment pursuant to Fed.R.Civ.P. 60(b). That changes the standard of review from the standard we would ordinarily employ if this were a direct appeal from the district court's judgment. The scope of review for a denial of a Rule 60(b) motion is simply whether the district court abused its discretion. *See Hand v. United States*, 441 F.2d 529, 531 (5th Cir.1941); C. Wright and A. Miller, *Federal Practice and Procedure*, § 2872. We do note that because of the strong policy of determining cases on their merits, defaults are seen with disfavor. *See, e.g., United Artists Corp. v. Freeman*, 605 F.2d 854, 856–57 (5th Cir.1979); *Charlton L. Davis & Co., P.C. v. Fedder*

*Data Center*, 556 F.2d 308 (5th Cir.1977); 6 Moore, *Federal Practice* ¶ 55.10[1] n. 21.

In the context of the denial of a motion to set aside a default judgment, however, a reviewing court will not examine the merits of the motion unless the defaulting party has met two prerequisites. The first is a showing that it had a meritorious defense to the action that might have affected the outcome. *See Moldwood Corp. v. Stutts*, 410 F.2d 351, 352 (5th Cir.1969); C. Wright and A. Miller, *Federal Practice and Procedure*, § 2697. The second requires showing that granting the motion would not result in prejudice to the nondefaulting party. C. Wright and A. Miller, *Federal Practice and Procedure*, § 2699.

We believe that the outcome of the *Gulf Coast v. Midwest* case is sufficient to demonstrate that PAX likely had a meritorious defense to Gulf Coast's claim against it. Similarly, we believe that if we should find an abuse of discretion by the district court in denying PAX's motion, then little prejudice will flow to Gulf Coast because of the weakness of its position on the merits of the case. Having concluded that PAX's motion to set aside the default judgment meets these prerequisites, we now determine whether the district court abused its discretion by denying PAX's Rule 60(b) motion.

### 3. *Discussion*

We believe that all of the issues PAX set forth in its Rule 60(b) motion to set aside the default judgment raise troubling questions. We do not decide whether, as a matter of law, the district court committed reversible error with its rulings on any of the issues raised by PAX. We do, however, hold that in light of all the circumstances of this case, the district court abused its discretion by refusing to set aside the default judgment.

Our decision is based on several factors. First, PAX's claim that the district court lacked in personam jurisdiction over it, although a very strong claim, was never resolved by the district court. PAX pressed its jurisdictional challenge throughout the pretrial proceedings, at which time PAX was an active participant in the case. PAX's challenge was based on the fact that PAX lacked minimum contacts with the state of Florida. PAX was located in Hong Kong and shipped all ceiling fans to Gulf Coast via Midwest, which took delivery of the fans in Hong Kong. Gulf Coast argued, however, that Midwest was actually an agent for PAX, and that through that agency relationship PAX had sufficient contacts with Florida to bring it within the district court's jurisdiction.

During pretrial proceedings in this case, the district court referred PAX's jurisdictional challenge to a magistrate who recommended that PAX be dismissed for lack of in personam jurisdiction. After reviewing the magistrate's report, however, the district court determined that the disputed agency relationship between PAX and Midwest created a factual issue that would have to be resolved at trial. That ruling put PAX in the uncomfortable position of having to prepare for a full-blown trial even if it might eventually prevail on the jurisdictional claim, and may have contributed to PAX's decision to refuse to appear at trial.

In denying PAX's Rule 60(b) motion, the district court stated that PAX waived the jurisdictional issue by failing to appear at trial. Although we agree with the district court that PAX's actions *may* have effected a waiver, we believe that in light of the other circumstances listed below, PAX is entitled to a definitive ruling on its jurisdictional challenge.

Second, we believe that PAX made a strong argument that it was entitled to a jury trial on damages, *see Bass v. Hoagland*, 172 F.2d 205, 208–09 (5th Cir.1949), although PAX may have waived that right at some point.

Third, determination of whether PAX waived its right to a jury trial is complicated by the apparent failure to provide PAX with three days notice, as required by Fed. R.Civ.P. 55(b)(2), of an October 19, 1982 hearing on damages. Although notice was served on PAX's counsel, counsel had with-

drawn from the case prior to trial. Therefore, notice had to be served on PAX. *See Bass v. Hoagland*, 172 F.2d 205, 209 (5th Cir.1949); Fed.R.Civ.P. 55(b)(2). Chan Kan Ping, a partner in PAX, filed an affidavit stating that PAX did not receive notice of the October 19 hearing until October 23. If PAX had received proper notice, it could have appeared at the hearing and reiterated its demand for a jury trial, or it could have failed to appear, from which we could infer a waiver of the jury demand and other procedural rights. Similarly, PAX could have appeared to contest the amount of damages, or it could have waived its right to contest damages by not appearing.

Fourth, when PAX finally did move for leave to file a memorandum in opposition to Gulf Coast's memorandum on damages, the district court denied PAX's motion even though no actual judgment had yet been entered. Although PAX's motion was untimely, we believe that the district court's action flies in the face of the policy readily apparent in Rule 55(b)(2), of affording even a defaulted party the opportunity to contest the award of damages against it. Presumably, that policy was designed to insure that a nondefaulting party does not receive a windfall in damages simply because the defaulting party failed to contest liability. Thus, Rule 55(b) demonstrates a strong policy against awarding anything more than *actual* damages. Therefore, we believe the district court should have accepted PAX's memorandum, which noted weaknesses in Gulf Coast's claim for a certain amount of damages. Of course, if PAX's memorandum on damages had been filed *after* the district court entered a judgment for a certain amount we would be less inclined to hold that it was an abuse of discretion to refuse to accept PAX's memorandum.

Finally, and perhaps most importantly, we are concerned that Gulf Coast could collect a half million dollar judgment against PAX when the jury in *Gulf Coast v. Midwest* found that Gulf Coast breached the contract upon which it sued PAX. If Gulf Coast had sued Midwest and PAX claiming that they were jointly liable, and if PAX had defaulted, but Midwest had prevailed at trial, it would be clear that Gulf Coast could not obtain a default judgment against PAX. *See Frow v. De La Vega*, 15 Wall. (82 U.S.) 552, 21 L.Ed. 60 (1872); *Broder v. Charles Pfizer & Co.*, 54 F.R.D.

583 (S.D.N.Y.1971); C. Wright & A. Miller, *Federal Practice and Procedure*, § 2690, 6 Moore, *Federal Practice*, ¶ 55.06. Both Moore and Wright and Miller suggest that even when defendants are similarly situated, but not jointly liable, judgment should not be entered against a defaulting defendant if the other defendant prevails on the merits. Wright and Miller, § 2690; 6 Moore ¶ 55.06; *see Ackron Contracting Co. v. Oakland County*, 108 Mich.App. 767, 310 N.W.2d 874, 877 (1981); *cf. Roach v. Churchman*, 431 F.2d 849, 855 (8th Cir. 1970); *Fehlhaber v. Indian Trails*, 425 F.2d 715 (3d Cir.1970). We believe that this is a sound policy. It would be incongruous and unfair to allow Gulf Coast to collect a half million dollars from PAX on a contract that a jury found was breached by Gulf Coast.

■ We by no means intend to condone PAX's actions in this case. The failure to appear at a duly scheduled trial after months of preparation by the parties and by the trial court is a serious offense for which the entry of a default is appropriate. Moreover, we share in the district court's frustration with PAX's erratic behavior: sometime after the briefs were filed in this appeal, counsel for PAX again withdrew, apparently because PAX refused to pay for counsel's services. Thus, PAX did not appear at the oral argument of this case. Nevertheless, providing Gulf Coast with an undeserved windfall from PAX is an inappropriate method of dealing with PAX's behavior. Thus, based on all of the circumstances of this case, we hold that the district court abused its discretion by failing to set aside the default judgment against PAX. Therefore, we vacate the default judgment and remand for further proceedings consistent with this opinion. Specifically, the trial court shall grant the motion to set aside the default judgment and enter a ruling as to the jurisdictional challenge; if it finds in favor of jurisdiction, it shall consider the claim of PAX that it is entitled to a jury trial under Rule 60(b) in light of the apparent absence of the prescribed three-day notice; and it shall also consider the motion of PAX to introduce evidence as to damages if it ultimately finds a default.

## CONCLUSION

For the reasons stated herein, the judgment in No. 83–3303, *Gulf Coast v. Mid-*

*west,* is AFFIRMED IN PART and VACATED IN PART and the judgment in No. 83–3455, *Gulf Coast v. PAX,* is VACATED and REMANDED for proceedings consistent with this opinion.